DEVLIN *v.* FARMER *et al.*

(*Common Pleas of New York City and County, General Term.*   April 7, 1890.)

GIFTS—CAUSA MORTIS—EVIDENCE.

Plaintiff claimed that certain bank books were a gift *causa mortis* to her by one F. Her husband, the only witness to the gift, testified that F., referring to the books, said to plaintiff: " 'You keep them. They are for you.' He said he thought he was going to die, and he wanted everything that was there to belong to her." This testimony was corroborated by plaintiff, so far as she could testify, and was not contradicted nor in any manner directly attacked. *Held,* that F.'s language, as testified to, was sufficiently definite to create a gift of the bank account.

Appeal from judgment on report of referee.

Annie A. Devlin against Ann Farmer, as administratrix of the estate of Henry Fitzsimmons, impleaded with the Greenwich Savings Bank. The referee found for the respondent Ann Farmer. Plaintiff appeals.

Argued before LARREMORE, C. J., and DALY and BISCHOFF, JJ.

*William H. Arnoux* and *Francis C. Devlin,* for appellant.   *Abram Kling,* for respondent.

LARREMORE, C. J.   This action was originally brought by plaintiff against the Greenwich Savings Bank to recover the amount of an account therein opened by the Reverend Henry Fitzsimmons, deceased, in his life-time. The plaintiff contends that the said deceased, who was her uncle, made to her a *donatio causa mortis,* in due form, of said account, a short time previous to his decease. The defendant, appellant, is the administratrix of the original depositor of the money, and, as she also claims such money in said bank as an asset of the estate, the bank interpleaded by order in proper form and duly entered, and this litigation has been conducted between the rival claimants to the fund. The testimony principally relied upon to establish the gift was that of plaintiff's husband, and was in effect as follows: "*Question.* When you were there, (at the residence of the deceased,) in his life-time, did he have any conversation with you about his illness and his anticipation of death? *Answer.* Yes, sir. He said he thought he was going to die. He wanted me to do something for him. He said he was out of money, and he wanted to sell some bonds that he had, and either bring him a certified check or money for the bonds, and he would use it, as he had been using some money of Mrs. Devlin's prior to that, and he gave plaintiff the key of a trunk to get them. I was sitting by the bedside, talking to him, reading a paper. He was sick in bed at the time. He told plaintiff to bring him a parcel, in my hearing, and he gave her the key of the trunk. I saw him hand her the key. She brought it down and handed it to him. He took the parcel and opened it. He took out three bonds. I think 5–20's they were. He took out the books and gave them to Mrs. Devlin. *Q.* You mean the bank books in question? *A.* Yes, sir. *Q.* What did he say? *A.* Mrs. Devlin said ' What am I to do with them?' He says, 'You keep them. They are for you.' He said he thought he was going to die, and he wanted everything that was there to belong to her. Everything he had." Also, upon cross-examination, said witness further testified as follows: "He handed these books to Mrs. Devlin. She asked him what she should do with them. He said for her to keep them. They were for her. He said that if he got well she should give them back to him. If he did not they were hers, and everything that belonged to him."

The learned referee evidently discredited the account given by plaintiff's husband of the alleged gift of the bank books. His testimony was not contradicted, or in any manner directly attacked, but the referee found for defendant, presumably upon the inherent improbability of the facts averred in plaintiff's behalf. I have not overlooked that, in the decision of this question of fact, direct contradiction could not be produced, as the conversation in which the alleged *donatio causa mortis* took place was had between the

deceased and plaintiff's husband, with no other person but plaintiff herself present. A court is not bound to grant a judgment upon the uncorroborated testimony of a single witness, especially if he be an interested witness, and his evidence in itself does not seem reasonable. Though the referee wrote no opinion, and we can only surmise as to the reasons that led him to dismiss the complaint, it nevertheless seems evident that he considered Mr. Devlin's testimony so improbable, and his interest in his wife's claims such a strong motive for perjury, that his story was to be entirely disregarded. After a careful examination of the case, I have concluded that in the interests of justice a new trial should be ordered. In the first place, the testimony of James Devlin, as to the delivery of the books and the accompanying words, is direct and straightforward. He is corroborated by his wife, the plaintiff, as far as she was permitted to testify. Then there is an undisputed fact, which to my mind furnishes very strong corroboration of Devlin's story, and that is the actual possession of the bank-books by plaintiff from the day of the alleged gift by the deceased down to the present time. Unless the deceased did give the bank-books to plaintiff, then, for some purpose, she stole them, and, in order to discredit plaintiff's evidence in this summary manner, we would be obliged to presume that she and her husband had committed larceny as well as perjury. The appellant practically concedes that plaintiff came rightfully into possession of the books, and the theory of a trust is suggested to explain such possession. There is no evidence, however, to charge plaintiff, as trustee, except it be the alleged, mysterious conversation between plaintiff and appellant, at which the latter avers that plaintiff said that she had $600 for her (appellant) if she would keep still. Plaintiff denies this conversation absolutely, and, even if it were true, there is nothing to connect the $600 with the bank-books, or to make it seem like anything more than the promise of a gift of that amount. On the other hand, granting, as defendants substantially do, that the bank-books came lawfully into plaintiff's hands, at or about the time when she swears they did, the corroborative testimony of the witness Mary Duffy becomes very significant. She is obviously friendly to plaintiff, but does not appear to be a strongly interested or a biased witness; nor was her evidence materially weakened by cross-examination. She says: "I knew there was a trunk in a closet. It was always kept there. Father Fitzsimmons carried the key to it himself." "*Question.* Did you ever see him give that key to Mrs. Devlin? *Answer.* Yes, sir. One morning after Mr. Devlin came he was sitting at the foot of the bed, and Mrs. Devlin was beside him, and he called me to him. I was in the room with a dust-pan and brush. I don't remember that I had done anything in the room. I don't know whether I had started to do anything, but I intended to; and he asked me to get his pants. I gave him the pants, and he took the key out of his pocket and gave it to Mrs. Devlin; and I went out of the room. This was some time in April. *Q.* You left before he had time to say anything? *A.* I left the room because I supposed I was not wanted. *Q.* Did you ever hear him say anything about books? *A.* Yes, sir; I did. He did not say bank-books. He said it in this way. He was after sleeping, and I gave him a drink. Mrs. Devlin was in New York, and I don't know whether she stayed one week or two. Before she returned I was left in charge to give him his medicine and to see to him as she told him. When I gave him the drink he said, 'I gave Annie the books, and if I want them back she will give them to me.'" The account of the transaction receives further slight corroboration from the fact that plaintiff's husband actually did carry the bonds, which were taken from the trunk at the same time with the bank-books, to New York, and convert them into money, and that he sent the amount thereof in the form of a check or draft to the decedent, by plaintiff, on her return to Wilkesbarre. This circumstance is very clearly established. Of course, plaintiff may, when she went to the trunk at her uncle's request to get the bonds, have feloniously,

and without his knowledge, abstracted the bank-books; but, as far as can be judged from the evidence in its printed form, and especially in view of the testimony of Mary Duffy, I should have been loath to adopt that theory. The evidence offered by defendant consisted of assertions on the part of various members of the family that they had not heard of plaintiff's claim of title to the books until a long time after she received them, and the alleged conversation between plaintiff and Ann Farmer, above referred to, about the gift of $600. These were, of course, circumstances to be considered and weighed; but it is by no means conclusive against the good faith of plaintiff's contention, although it may have been imprudent, that she kept silent, if she supposed that her right would be immediately disputed and attacked. The alleged conversation between the parties about the $600 is too vague to have much practical force of any kind. On the one side we have positive testimony, and a consistent and coherent statement of facts, corroborated as before shown in many material points. On the other we have only negations of matters not in themselves very material. One of the points, upon which great stress was laid by the learned counsel for the respondent to discredit the probability of plaintiff's evidence, was that both she and her husband testify that they have not had any private conversations with each other about these bank-books or this litigation. This fact may seem strange at first sight, but, on the other hand, it must be remembered that the plaintiff's counsel, who is also the brother of her husband, resides with them, and she avers that she has had many and constant consultations with him. A point was also made of the fact that the words of the decedent, relied upon to establish this cause of action, were broad enough to give plaintiff all of his possessions as well as the bank-books in question, and that she has never attempted to assert any rights thereunder except to claim the savings-bank deposits. But Father Fitzsimmons' language, as reported by James Devlin, was sufficiently definite to create a gift of the bank accounts, and not definite enough to carry anything else. The valid portion of the gift would not be vitiated by any other words that accompanied it, and it does not seem at all unnatural that plaintiff never supposed for a moment that her uncle could have intended any specific gift at that time except that conveyed by the bank-books which he simultaneously handed over. There seems such a strong probability that the referee did not decide according to the weight of evidence that the judgment should be reversed and a new trial ordered, with costs to abide the event. All concur.